**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL SZTROM and DAVID SZTROM, *Plaintiffs*, | |
| v. | Civil Action No. 1:24-cv-3548 |
| SECURITIES AND EXCHANGE COMMISSION, *Defendant*. | **ORAL ARGUMENT REQUESTED** |

# PLAINTIFFS MICHAEL SZTROM'S AND DAVID SZTROM'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Of counsel:*
Mary P. Hansen*
Michael D. Crosson*
Duane Morris LLP
30 S. Seventeenth St.
Philadelphia, Pa. 19103
Telephone: (215) 979-1000
Facsimile: (215) 979-1020
MPHansen@duanemorris.com
MDCrosson@duanemorris.com

* Admitted *pro hac vice*

Michael J. Rinaldi (D.C. 483417)
Duane Morris LLP
30 S. Seventeenth St.
Philadelphia, Pa. 19103
Telephone: (215) 979-1000
Facsimile: (215) 979-1020
MJRinaldi@duanemorris.com

*Counsel for Plaintiffs*
*Michael Sztrom and David Sztrom*

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ........ 1

II. FACTS ........ 2

III. LEGAL STANDARD ........ 5

IV. ARGUMENT ........ 6

A. The District Court Has Subject-Matter Jurisdiction Over Counts III (Jury Trial) and IV (Hearing Under the Advisers Act and the APA) ........ 6

B. The Sztroms' Complaint States Claims Upon Which Relief May Be Granted .... 15

1. The SEC's Follow-On Administrative Proceeding Violates the Sztroms' Due Process Rights (Count I) ........ 15

2. The SEC's Prosecution of the Sztroms Must Be Adjudicated in an Article III Court (Count II) ........ 20

3. The SEC's Administrative Proceeding Violates the Sztroms' Seventh Amendment Right to a Jury Trial (Count III) ........ 23

4. The Sztroms Have a Statutory Right to a Hearing (Count IV). ........ 24

V. CONCLUSION ........ 28

# TABLE OF AUTHORITIES

**Cases**

*Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137 (D.C. Cir. 2011)........................................5

*AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67 (2021)........................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................5

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023)........................................*Passim*

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004)........................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................5

*Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099 (D.C. Cir. 1988)........................................15, 18-20

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)........................................24-25, 27

*Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021)........................................7

*Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85 (D.D.C. 2011)........................................5

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)........................................*Passim*

*Gabelli v. SEC*, 568 U.S. 442 (2013)........................................19

*Johnson v. Robison*, 415 U.S. 361 (1974)........................................12, 24

*Johnson v. SEC.*, 87 F.3d 484 (D.C. Cir. 1996)........................................22

*Kokesh v. SEC*, 581 U.S. 455 (2017)........................................19

*Kornman v. SEC*, 592 F.3d 173 (D.C. Cir. 2010)........................................24, 26

*Liu v. SEC*, 591 U.S. 71 (2020)........................................19

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)........................................*Passim*

*In re Murchison*, 349 U.S. 133 (1955)........................................16-17, 19

*New York Republican State Committee v. SEC*, 799 F.3d 1126 (D.C. Cir. 2015)........................................13

*Saad v. SEC*, 873 F.3d 297 (D.C. Cir. 2017) (Kavanaugh, J., concurring)........................................22

*SEC v. Jarkesy*, 603 U.S. 109 (2024)........................................*Passim*

*SEC v. Sztrom*, No. '21CV86 (S.D. Cal. Compl. filed 1/15/2021)........................................3

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ........ *Passim*

*Trump v. J.G.G.***,** 145 S. Ct. 1003, 1006 (2025) ........ 17

*Tull v. United States*, 481 U.S. 412 (1987) ........ 24

*Williams v. Pa.*, 579 U.S. 1 (2016) ........ 16-17, 19

*Wilson v. District of Columbia*, 269 F.R.D. 8 (D.D.C. 2010) ........ 5

*Withrow v. Larkin*, 421 U.S. 35 (1975) ........ 16-17, 19-20

**Constitutional Provisions**

U.S. Const. art III ........ *Passim*

U.S. Const. art. III, § 2 ........ 20-21, 23

U.S. Const. amend. V ........ 1, 10, 28

U.S. Const. amend. VII ........ 10

**Statutes**

5 U.S.C. § 551 et seq. ........ *Passim*

5 U.S.C. § 554(b)(1) ........ 26

5 U.S.C. § 554(c)(2) ........ 26

5 U.S.C. § 556 ........ 26

5 U.S.C. § 556(d) ........ 27

5 U.S.C. § 557 ........ 26

5 U.S.C. § 706 ........ 25

15 U.S.C. § 78a et seq. ........ 6, 7

15 U.S.C. § 78y(a)(1) ........ 10

15 U.S.C. § 80(b)–1 et seq. ........ *Passim*

15 U.S.C. § 80(b)–13(a) ........ 10, 14

15 U.S.C. § 80(b)–3(f) ........ 4, 21, 24, 26

15 U.S.C. § 80b–13(a) ........ 10, 13

28 U.S.C. § 1331 ....................6, 14

50 U.S.C. § 21 et seq. ....................17

**Court Rules**

Fed. R. Civ. P. 12(b)(1) ....................5

Fed. R. Civ. P. 12(b)(6) .................... 5, 27-28

**Other Authorities**

Alexander Platt, *Is Administrative Summary Judgment Unlawful?*, Harv. J.L. & Pub. Pol'y 239, 251–59 (2021) ....................16

Alexander Platt, *Unstacking the Deck: Administrative Summary Judgment and Political Control* ....................16

*In re Sztrom*, Administrative Proceeding File No. 3-21400, 2023 WL 3243514 (S.E.C. May 2, 2023) (OIP) ....................4, 21

*In re Kara*, Release No. 979, 2016 WL 1019197, at *7 (S.E.C. ALJ Mar. 15, 2016) ....................16

SEC Announces Enforcement Results for Fiscal Year 2024, https://www.sec.gov/newsroom/press-releases/2024-186 ....................18

Urska Velikonja, *Reporting Agency Performance: Behind the SEC's Enforcement Statistics*, 101 Cornell L. Rev. 901, 963, 967 (2016) ....................16

## I. <u>PRELIMINARY STATEMENT</u>

The issue the before the Court is whether the Securities and Exchange Commission can permanently bar Michael and David Sztrom from the securities industry, and thereby deprive them of their ability to earn a living through their chosen profession, through an in-house "tribunal" where the SEC itself is prosecutor, judge, and jury, or whether—consistent with more recent Supreme Court precedents—what the SEC seeks to do here runs afoul of the Seventh Amendment, Article III, and the due process clause of the Fifth Amendment, as well as various statutory protections.

To put it simply, after concluding a proceeding in the District Court for the Southern District of California—which resulted in a "no admit, no deny" settlement, an "obey the law" injunction, and a $25,000 civil penalty against each of the Sztroms—the SEC has sought, many years after the relevant events, to resurrect its prosecution against the Sztroms and to seek even more severe sanctions than the modest relief obtained in the Article III Court. What's more, according to the SEC, it should be able to obtain those severe sanctions without the Sztroms having the benefit of a jury of their peers, outside an Article III Court and without the attendant due process rights, and without even a hearing before the "court" that the SEC asserts should decide their fate, the "court" being the SEC itself. And, in the SEC's view, this Court does not even have the right to decide many of these questions, and, instead, the Sztroms must go through this constitutionally infirm process before their objections can even be heard by an Article III Court.

In an attempt to get around the salient constitutional principles and what logically flows from them, the SEC relies on old, and undermined, precedents and misstates what the Supreme Court, just last year, has held. For instance, by gluing together quotations from various parts of the Supreme Court's decision in *Jarkesy*, the SEC argues that this Court should have "no

involvement" here because the matter involves "public rights."[1] But what the Court actually said, consistent with well-established precedent, is:

> [E]ven with respect to matters that arguably fall within the scope of the "public rights" doctrine, *the presumption is in favor of Article III courts*. And for good reason: Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's "judicial Power" on entities outside Article III.[2]

Ultimately, that's what this case is about. Can Congress legislate away the right of the Sztroms to have the executive branch's serious allegations against them—which are accompanied by serious consequences—tested in an Article III Court and with all of the constitutional protections that come along with that? Because the answer to that question is "no," it follows that the SEC's motion to dismiss should be denied.

## II. <u>FACTS</u>

Plaintiffs Michael Sztrom and David Sztrom are investment advisers who provide investment advisory services to high-net-worth individuals through Sztrom Wealth Management, Inc. ("SWM"). (*See* Compl. ¶ 1 [ECF 1].) David is Michael's son. (*Id.*) This father and son team have worked in the securities industry for many years and continue to earn their livings as investment advisers. (*Id.* ¶ 14.) Many of SWM's clients have been clients of the elder Sztrom for over twenty years. (*Id.* ¶ 1.)

Michael Sztrom has been associated with various securities firms since 1998. (*Id.* ¶ 15.) Until late 2015, he served as an investment adviser representative and a broker-dealer registered representative for a large securities firm. (*Id.*) After Michael left the securities firm in 2015, he

---

[1] SEC's Mot. at p. 18 [ECF 12-1].
[2] *SEC v. Jarkesy*, 603 U.S. 109, 132 (2024) (citations and internal quotation marks omitted and emphasis added).

worked as a certified financial planner. (*Id.*) In July 2016, Michael registered Sztrom Capital Management as an investment adviser with the State of California. (*Id.*) Since 2018, Michael has been acting as an investment adviser with Integrated Advisors Network, d/b/a SWM. (*Id.*)

David is also an investment adviser. (*Id.* ¶ 16.) From November 2015 until March 2018, he was associated with a registered investment adviser. (*Id.*) Since 2015 and through today, David has also been associated with SWM. (*Id.*)

In January 2021, after a lengthy and costly investigation, the Securities and Exchange Commission ("SEC") filed a complaint in the U.S. District Court for the Southern District of California against the Sztroms alleging violations of the Investment Advisers Act of 1940 ("Advisers Act"). (*Id.* ¶ 1.[3]) The SEC's 2021 complaint alleged that, from November 2015 through March 2018, the Sztroms breached their fiduciary duties and defrauded clients. (Compl. ¶ 17.)

According to the SEC's complaint, David assisted his father, Michael, with accessing confidential client information and gaining access to an associated broker-dealer so that Michael could advise his clients and execute trades, even though Michael was not associated with a registered investment adviser at the time. (*Id.* ¶ 18.)

The SEC's federal court complaint did not allege any financial harm to any client. (*Id.* ¶ 19.) Moreover, the underlying alleged conduct occurred more than three years before the filing of the complaint. (*Id.*)

The Sztroms settled with the SEC on October 6, 2022, without admitting or denying the SEC's allegations. (*Id.* ¶ 1.) The Consent Judgment did not order any disgorgement or

[3] *SEC v. Sztrom*, No. 3:21-CV-86 (S.D. Cal. Compl. filed 1/15/2021).

prejudgment interest. (*Id.*) The Sztroms agreed to pay a penalty of $25,000 each and were enjoined from violating certain provisions of the federal securities laws. (*Id.*)

On May 2, 2023, nearly seven months after the Sztroms' neither-admit-nor-deny settlement with the SEC, the SEC issued an Order Instituting Proceedings ("OIP") pursuant to Section 203(f) of the Advisers Act against Michael Sztrom and David Sztrom seeking to deprive them permanently of their livelihoods. (*Id.* ¶ 2.[4]) Notably, the SEC did not seek this relief in federal district court with the guaranteed protections of a hearing and a jury of the Sztroms' peers. (Compl. ¶ 2.) Rather, the SEC seeks the drastic remedy of a permanent industry bar—essentially a career death penalty—in what is referred to as a "follow-on" administrative proceeding in which the Sztroms have no guarantee of a hearing, and the people who decide their fate are a part of the same government agency that has been prosecuting them for almost four years. (*Id.*) Moreover, the SEC's Division of Enforcement has sought to deprive the Sztroms of the ability to present any evidence at all at a hearing as to why permanent bars are not in the public interest by filing a motion for summary disposition solely based on the Consent Judgment. (*Id.*)

The Sztroms continued to serve their SWM clients after the SEC initiated its investigation in 2021 through the filing and the settlement of the district court litigation, and after the filing of the follow-on administrative proceeding—and they continue to do so to this day. (*Id.* ¶ 35.) The Sztroms have done so without any violations of the securities laws, consistent with their promises as part of the settlement. (*Id.* ¶ 27.) The Sztroms' clients are well aware of the SEC's allegations and choose to continue to rely on the Sztroms for investment advice. (*Id.* ¶ 35.) To date, the SEC has not issued a decision on the motion for summary disposition. (*Id.* ¶ 24.) The Sztroms live

[4] *In re Sztrom*, Administrative Proceeding File No. 3-21400, 2023 WL 3243514 (S.E.C. May 2, 2023) (OIP).

with a foreboding sense of doom waiting for the SEC to grant the summary disposition motion, which would put them out of their business instantly. (*Id.*)

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim for relief when there is a "lack of subject-matter jurisdiction." When evaluating a Rule 12(b)(1) motion, "the court must 'accept as true all of the factual allegations contained in the complaint.'" *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85, 89 (D.D.C. 2011) (quoting *Wilson v. District of Columbia*, 269 F.R.D. 8, 11 (D.D.C. 2010) (citations omitted)). The court should also "review the complaint liberally while accepting all inferences favorable to the plaintiff." *Id.* (citing *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).

Separately, a Rule 12(b)(6) motion tests whether a plaintiff's complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff receives the "benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks and citation omitted). But raising a "sheer possibility that a defendant has acted unlawfully" fails to satisfy the facial plausibility requirement. *Iqbal*, 556 U.S. at 678. Rather a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although the court must "assume [the] veracity" of any "well-pleaded factual allegations" in the complaint, conclusory allegations "are not entitled to the assumption of truth." *Id.* at 679.

## IV. ARGUMENT

### A. The District Court Has Subject-Matter Jurisdiction Over Counts III (Jury Trial) and IV (Hearing Under the Advisers Act and the APA)

The Court should deny the SEC's motion to dismiss Counts III and IV for lack of subject-matter jurisdiction. The Supreme Court has held that district courts have subject-matter jurisdiction over constitutional challenges to administrative proceedings despite the presence of a claim-channeling provision in the challenged statute. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185, 196 (2023); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489–91 (2010). In *Axon*, the Supreme Court considered whether district courts have jurisdiction to hear constitutional challenges to both SEC and Federal Trade Commission ("FTC") administrative enforcement actions even though the challenged statutes "provide for a review of a final [FTC or SEC administrative] decision in a court of appeals, rather than a district court." *Id.* at 180–81. The case challenging the SEC decision arose from an SEC enforcement action wherein an administrative law judge ("ALJ") found that the plaintiff (the "SEC-plaintiff") violated the Securities Exchange Act of 1934 (the "Exchange Act") through her failure to comply with auditing standards. *Id.* at 182. Following the issuance of the ALJ's decision, the Supreme Court held that the SEC's ALJs were improperly appointed, necessitating a new hearing conducted by a validly-appointed ALJ. *Id.* Before that new hearing was held, however, the SEC-plaintiff sued the SEC in federal district court, asserting jurisdiction under 28 U.S.C. § 1331. *Id.* The SEC-plaintiff alleged that (i) the fact that ALJs may only be removed by the U.S. Merit Systems Protection Board, whose members can only be removed by the President for good cause, insulates ALJs from presidential supervision to an extent that violates the separation of powers (specifically, Article II); and (ii) by virtue of such insulation, ALJs could not constitutionally exercise power, neither through holding hearings nor making decisions. *Id.* at 182–83. The SEC-plaintiff in *Axon* essentially alleged that she was

subject to an unlawful administrative proceeding and that "being subjected to such an illegitimate proceeding causes legal injury (independent of any rulings [that might be made in the administrative proceeding])." *Id.* at 182.

The SEC-plaintiff's district court action was dismissed for lack of subject-matter jurisdiction, with the district court holding that the Exchange Act's scheme requiring administrative review followed by judicial review in a court of appeals "'implicitly divest[s] district courts of jurisdiction' over 'challenges to SEC proceedings,'" including those that are constitutional in nature. *Id.* at 184 (citations omitted). The SEC-plaintiff appealed, and the *en banc* Court of Appeals for the Fifth Circuit reversed and held that the SEC-plaintiff's "removal power claim is not the type of claim Congress intended to funnel through the Exchange Act's statutory-review scheme." *Id.* (citing *Cochran v. SEC*, 20 F.4th 194, 206–07 (5th Cir. 2021)). The Fifth Circuit reasoned that the SEC-plaintiff's "claim would not receive 'meaningful judicial review' in a court of appeals; that the claim was 'wholly collateral to the Exchange Act's statutory-review scheme'; and that the claim fell 'outside the SEC's expertise.'" *Id.* (citing *Cochran*, 20 F.4th at 207–08). With the Fifth Circuit's decision deviating from the decision reached by the court of appeals deciding the FTC-plaintiff's claim, the Supreme Court granted certiorari in both cases to resolve the conflicting decisions. *Id.* at 185.

The Supreme Court affirmed the Fifth Circuit and held that the statutory review scheme in the Exchange Act did not deprive the district court of jurisdiction to hear the SEC-plaintiff's "far-reaching constitutional claims" regarding the legitimacy of the statutory review scheme in and of itself. *Id.* at 185, 196. The Supreme Court stated that, although "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action[,]" such a statutory review scheme "does not necessarily extend to every claim

concerning agency action." *Id.* at 185. Following the precedent established by *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court questioned "whether the particular claims brought were 'of the type Congress intended to be reviewed within this statutory structure'"—"whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Axon*, 598 U.S. at 186 (citing *Thunder Basin*, 510 U.S. at 212). Similarly, the Supreme Court adhered to the so-called "*Thunder Basin* factors" in considering this question: (i) whether "precluding the district court jurisdiction 'foreclose[d] all meaningful judicial review' of the claim"; (ii) whether the claim is "'wholly collateral to [the] statute's review provisions'"; and (iii) whether the claim is "'outside the agency's expertise.'" *Id.* (quoting *Thunder Basin*, 510 U.S. at 212–13). The Supreme Court explained that the first *Thunder Basin* factor "recognizes that Congress rarely allows claims about agency action to escape effective judicial review," and that the second and third *Thunder Basin* factors "reflect in related ways the point of special review provisions—to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." *Id.* at 186.

Holding in favor of the plaintiffs, the Supreme Court explained that their Article II challenges were "not to any specific substantive decision," nor were "they to the commonplace procedures agencies use to make such a decision." *Id.* at 189. Instead, the plaintiffs' challenges were "to the structure or very existence of an agency: They charge that an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Id.*

The Supreme Court went on to apply the *Thunder Basin* factors, finding "each of the three *Thunder Basin* factors signals that a district court has jurisdiction to adjudicate [the plaintiffs'] sweeping constitutional claims." *Id.* Starting with whether preclusion of district court jurisdiction could foreclose all meaningful judicial review, the Supreme Court stated that, although "adequate

judicial review does not usually demand a district court's involvement," a problem remains because of "the interaction between the alleged injury and the timing of review." *Id.* at 190–91. The harm alleged by plaintiffs—that they were being subjected to unconstitutional agency authority via "a 'proceeding by an unaccountable ALJ'"—is "a here-and-now injury." *Id.* at 191. The harm is "impossible to remedy once the proceeding is over, which is when the appellate review kicks in." *Id.* The plaintiffs' claims are "about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker"—a grievance that "the court of appeals can do nothing" about because "[a] proceeding that has already happened cannot be undone." *Id.* Holding that the first *Thunder Basin* factor weighed in the plaintiffs' favor, the Supreme Court emphasized that the plaintiffs "will lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over." *Id.* at 192.

Turning to the second factor, concerning whether the claim is wholly collateral to the statute's review provisions, the Supreme Court likewise found that it cut in plaintiffs' favor. *Id.* Because the plaintiffs were "challenging the [SEC's and FTC's] power to proceed at all, rather than actions taken in the agency proceedings," the challenges qualified as "collateral." *Id.* at 192–93. The plaintiffs "object[ed] to the Commissions' power generally, not to anything particular about how that power was wielded." *Id.* at 193. The plaintiffs' claims did "not relate to the subject of the enforcement actions" nor to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* Ultimately, the plaintiffs' claims "have nothing to do with the enforcement-related matters the Commissions 'regularly adjudicate[]'—and nothing to do with those they would adjudicate in assessing the charges against [the plaintiffs]." *Id.* Thus, the Supreme Court determined the claims to be "'collateral' to any Commission orders or rules from which review might be sought." *Id.* (internal citations omitted).

Lastly, the Supreme Court found that the third *Thunder Basin* factor militated in favor of hearing plaintiffs' claims. *Id.* at 194. "Claims that tenure protections violate Article II . . . raise 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Id.* (citing *Free Enter. Fund*, 561 U.S. at 491). The plaintiffs' claims that the "ALJs are far too insulated from the President's supervision" and "challenge to the combination of prosecutorial and adjudicative functions" are "distant from the [Commissions'] 'competence and expertise.'" *Id.* The Commissions know "nothing special about the separation of powers," and, "[f]or that reason, [the Supreme Court] observed . . . , 'agency adjudications are generally ill suited to address structural constitutional challenges'—like those maintained in [*Axon*]." *Id.* at 194–95 (internal citations omitted).

The Court here should follow the analysis set forth by the *Axon* Court. To start, the claim-channeling provision that the Supreme Court analyzed in *Axon* is functionally identical to the one in the Advisers Act on which the SEC relies here. *Compare id.* at 181 (quoting 15 U.S.C. § 78y(a)(1)), *with* 15 U.S.C. § 80b–13(a). Both provisions provide that a party "aggrieved by" an order issued by the SEC "may obtain review" of the order in the appropriate court of appeals. 15 U.S.C. § 78y(a)(1); 15 U.S.C. § 80b–13(a). Further, and similar to the *Axon* plaintiffs, the Sztroms assert claims in Counts Three and Four that are constitutional or statutory in nature: (i) the unlawful deprivation of the right to a jury trial in violation of the Fifth and Seventh Amendments due to SEC's attempt to deprive the Sztroms of their liberty and private property rights to pursue their chosen professions and sources of livelihood through the follow-on administrative prosecution (Compl. ¶¶ 45–47); and (ii) the unlawful deprivation of the right to a hearing on the record due to the SEC's year-and-a-half long follow-on administrative prosecution solely being adjudicated on the papers with no likely opportunity for a hearing (*id.* ¶¶ 48–52). Like the plaintiffs in *Axon*, the

Sztroms are challenging the SEC's power to proceed at all (*see id.* ¶¶ 47, 48–51), given these infirmities with the administrative proceeding. *See Axon*, 598 U.S. at 192.

Turning to the *Thunder Basin* factors, *first*, preclusion of district court jurisdiction would foreclose all meaningful judicial review. Like the *Axon* plaintiffs, the Sztroms' complaint—including its claims of a right to a jury trial and a right to a hearing on the record—could be described as challenging "an illegitimate proceeding, led by an illegitimate decisionmaker." *Id.* at 191. Thus, as in *Axon*, the Sztroms challenge "the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process." *Id.* at 192. Here, the "claim[s] in question" are of the type over which the Supreme Court has found that district courts have subject-matter jurisdiction, even when the statute provides for review of final agency decisions in a court of appeals. *Id.* at 185, 195–96.

*Second*, the Sztroms' claims are "wholly collateral to [the] statute's review provisions." *Id.* at 186 (quoting *Thunder Basin*, 510 U.S. at 212). This is so because, as in *Axon*, the Sztroms are challenging the SEC's "power generally" to adjudicate follow-on administrative proceedings, in part because the proceedings lack a jury and the right to a hearing on the record. *Id.* at 193. The Sztroms' claims do not relate to SEC enforcement matters, but instead go to the heart of *how* the SEC adjudicates such matters. The Sztroms are not challenging actions taken in the agency proceedings. Rather, they are "challenging the Commission's power to proceed at all." *Id.* at 192–93. As such, the Sztroms' claims are "collateral to any Commission orders or rules from which review might be sought." *Id.* at 193 (quotation omitted). The fact that the SEC's follow-on administrative proceeding against the Sztroms is pending does not change this analysis. *See id.* at 194 (stating that "the [collateral] inquiry contemplates (as our collateral-order doctrine also does) that even when a proceeding is pending, an occasional claim may get immediate review . . . .").

*Third*, the Sztroms' claims are "outside the agency's expertise." *Id.* at 186 (quoting *Thunder Basin*, 510 U.S. at 212). Here, the Sztroms' "constitutional challenge" in Count III is "distant from" the SEC's expertise, as the SEC's expertise is market regulation—not the nuances of when a litigant has a constitutional right to a jury trial. *Axon*, 598 U.S. at 194. And, as to the Sztroms' claim in Count IV of a right to a hearing on the record, "the statutory questions involved do not require 'technical considerations of [agency] policy.'" *Free Enter. Fund*, 561 U.S. at 491 (quoting *Johnson v. Robison*, 415 U.S. 361, 373 (1974)). The questions involved herein "are instead standard questions of administrative law, which the courts are at no disadvantage in answering." *Id.* Constitutional and statutory interpretation are decidedly the role of courts, not agencies. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024) ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do.").[5]

In an effort to distinguish *Axon*, the SEC relies on a purported distinction between "procedure" and "structure" that was not a part of the Supreme Court's reasoning in *Axon* and does not hold up as a matter of logic. (SEC's Mot. at pp. 7–8.) First, to the extent *Axon* discussed "procedures," it noted simply that the plaintiffs in *Axon* were not challenging "commonplace procedures agencies use to make" decisions. 598 U.S. at 189. The Court did not elaborate on what constitutes a challenge to an agency's "commonplace procedures," but it noted that the plaintiffs in *Axon* were instead challenging "the structure or very existence of an agency" and asserting that

[5] The fact that Count IV relates to the statutory interpretation of the Administrative Procedure Act ("APA") and the Advisers Act (as opposed to the constitutional issue as to Count III) is immaterial because, as the Supreme Court held in *Loper Bright*, statutory interpretation is well within the purview of federal courts, and courts are not required to defer to an agency's preferred interpretation simply because there may be ambiguity. Here, as it happens, there is no ambiguty, but, in any event, there is no reason to defer to SEC and no reason this Court lacks subject-matter jurisdiction to hear the Sztrom's claims. See Section IV.B.4., *infra* pp. 24–26, for a fulsome discussion of the impact of *Loper Bright* on the role of federal courts in interpreting statutes.

an agency was "wielding authority unconstitutionally." *Id*. Whatever is to be made of the Court's passing reference to "commonplace procedures," it does not support the rigid dichotomy that the SEC now seeks to apply in this case. Indeed, the lack of the "procedures" of a jury trial or a right to a hearing is part of what makes the whole proceeding "structurally" unfair and unconstitutional. And, as with the plaintiffs in *Axon*, the Sztroms' challenges "are not to any specific substantive decision [by the SEC]." *Id*. Instead—and similar to *Axon*—the Sztroms are challenging the very fact of being required "to undergo the complained-of-agency proceedings," in part because the proceeding's deficiencies include the lack of a jury of their peers and the lack of a hearing on the record. *Id.* at 192.

The SEC's reliance on *New York Republican State Committee v. SEC*, 799 F.3d 1126 (D.C. Cir. 2015), is even more strained. In *New York Republican State Committee*, the plaintiffs challenged a final rule promulgated by the SEC, and the question was whether the Advisers Act's use of the word "order" in 15 U.S.C. § 80b–13(a) encompasses a challenge to a "rule." 799 F.3d at 1128–34. Here, by contrast, there is not a final order, and the Sztroms are challenging the here-and-now injury of being subject to an ongoing constitutionally and statutorily deficient enforcement proceeding. As such, the context of the Sztroms' challenge is akin to those in *Free Enterprise* and *Axon*, not the D.C. Circuit's decision in *New York Republican State Committee*.

In addition to the fact that the Sztroms' challenge maps nicely to the facts in *Axon* and *Free Enterprise*, the text of the Advisers Act states that "a party *aggrieved* by an order issued by the Commission under this subchapter may obtain a review of such order in the [appropriate] United States court of appeals." 15 U.S.C. § 80b–13(a). (emphasis added). As such, this claim-channeling provision does not apply until a party is "aggrieved by" a final SEC order. *Axon*, 598 U.S. at 210 (Gorsuch, J., concurring). There is no final order here.

Moreover, independent of any balancing of factors to determine congressional intent, the Court has subject-matter jurisdiction directly from the plain text of 28 U.S.C. § 1331. *See Axon*, 598 U.S. at 204–05, 209–11 (Gorsuch, J., concurring). Section 1331 "provides that 'district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.' Not *may* have jurisdiction, but *shall*. Not *some* civil actions arising under federal law, but *all*." *Id.* at 205 (Gorsuch, J., concurring). As Justice Gorsuch observed, "[t]he statute is as clear as statutes get." *Id.* at 205 (Gorsuch, J., concurring).

Because Section 1331 vests district courts with jurisdiction to hear this case, "the only question properly before [the court] is whether Congress has *actually* carved out some exception in some other statute." *Id.* at 209 (Gorsuch, J., concurring). Here—and like the statutes at issue in *Axon*—the provision in the Advisers Act on which the SEC relies applies only when a party is "aggrieved by an order issued by the Commission." 15 U.S.C. § 80(b)–13(a). Not only do the Sztroms "not seek to challenge an SEC final order," but they could not do so "because the agency has not entered one in [their] case." *Axon*, 598 U.S. at 210 (Gorsuch, J., concurring). The Sztroms do "not even seek relief in anticipation of a final agency order. Instead, [they] seek[] to avoid being hauled before an agency that [they] allege[] is unconstitutionally structured. That is exactly the kind of 'here-and-now injury' [the Supreme Court] has held 'can be remedied by a court' without regard to the eventual outcome of agency proceedings." *Id.* (internal citations omitted). For this reason alone, this Court has subject-matter jurisdiction over the Sztroms' claims in Counts III and IV.

### B. The Sztroms' Complaint States Claims Upon Which Relief May Be Granted

#### 1. *The SEC's Follow-On Administrative Proceeding Violates the Sztroms' Due Process Rights (Count I)*

The SEC relies almost entirely on the argument that *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099 (D.C. Cir. 1988), precludes the Sztroms' due process argument, though it does not attempt to defend the reasoning of *Blinder*. The Sztroms acknowledge that their due process claim is in tension with the D.C. Circuit's decision in *Blinder*. As the Sztroms alleged in their complaint, the SEC's reliance on *Blinder* is wrong because the holding and reasoning of *Blinder* are at odds with more recent decisions of the U.S. Supreme Court. *Id*.

First, it is important to remember the context of what the SEC is attempting to do to the Sztroms. After filing a case and litigating against the Sztroms before an Article III judge in a federal district court, the SEC agreed to settle the case for a payment of $25,000 from each of them, among other relief. The Sztroms' monetary settlements (individually or collectively) were very low, and for good reason. No investor lost any money as a result of the Sztroms' alleged conduct.

In addition to the low fine, the Sztroms each consented to injunctions that prohibit them from any future violations of the Advisers Act. Based on these "obey the law" injunctions, the SEC now seeks to permanently bar the Sztroms from the securities industry. And it seeks to do so without any suggestion that the Sztroms have failed to obey the law in the more than seven years since the underlying conduct that was the basis for the SEC's original enforcement action, and more than four years since the SEC filed its federal court complaint against the Sztroms.

The SEC did not seek an occupational bar in federal court. Instead, the SEC waited more than six months after the parties settled the federal court case to bring a "follow-on" administrative proceeding in which it seeks to permanently bar the Sztroms from their chosen careers. The same

agency that has prosecuted the Sztroms all along will now decide their fate, with the right to impose this career death penalty very likely without so much as a hearing. *See* Urska Velikonja, *Reporting Agency Performance: Behind the SEC's Enforcement Statistics*, 101 Cornell L. Rev. 901, 963, 967 (2016); *accord In re Kara*, Release No. 979, 2016 WL 1019197, at *7 (S.E.C. ALJ Mar. 15, 2016) ("[F]rom 1995 to [March 2016], there have been over forty-six litigated follow-on proceedings based on antifraud injunctions or convictions in which the Commission issued opinions, and all of the respondents were barred—forty-three unqualified bars and three bars with the right to reapply after five years."); *see also* Alexander Platt, *Is Administrative Summary Judgment Unlawful?*, Harv. J.L. & Pub. Pol'y 239, 251–59 (2021) (reviewing the history of the SEC's use of summary disposition in "follow-on" proceedings in which the SEC seeks an additional penalty following a finding of liability in another venue); Alexander Platt, *Unstacking the Deck: Administrative Summary Judgment and Political Control*, 34 Yale J. on Regul. 439, 461–69 (2017) (noting with disapproval the SEC's routine and increasing reliance on summary disposition to adjudicate follow-on cases since 2002).

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). The basic requirement of due process requires not just the "absence of actual bias in the trial of cases," but also to "endeavor[] to prevent even the probability of unfairness." *Id*. "To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *Id*.

More recently, the Supreme Court has reiterated that the "appearance of neutrality" is important for "the guarantee of due process [] to be adequately implemented" in a proceeding. *Williams v. Pa.*, 579 U.S. 1, 14 (2016) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Although the Court quoted from *Withrow* in its decision in *Williams*, it took a considerably broader

view of the protections of due process than the *Withrow* decision did. In *Williams*, the Court held that an appellant's due process rights were violated when one of the State's supreme court justices considering his case was also the district attorney thirty years earlier who "officially approved" the prosecutor's recommendation to seek the death penalty against the appellant. 579 U.S. at 4, 16. Moreover, the U.S. Supreme Court reached this conclusion despite the fact that the Pennsylvania Supreme Court's decision was unanimous. *Id.*[6]

The SEC's follow-on administrative proceedings do not come close to an "appearance of neutrality," and there is more than just the "probability of unfairness." *Williams*, 579 U.S. at 14; *In re Murchison*, 349 U.S. at 133. The data on the SEC's approach to these proceedings confirms what common sense suggests—respondents such as the Sztroms do not stand a chance. *See* Compl. ¶¶ 11–13 (discussing respondents' lack of success in defending themselves against the SEC's follow-on administrative proceedings, the SEC's adjudication of such proceedings by its own internally-appointed ALJs, and the prevalence of SEC ALJs deciding such proceedings through summary disposition without a jury trial or even the evidentiary hearing required by the Advisers Act and the APA). Although it's true that *Williams* and *In re Murchison* involved the same individual (as opposed to agency) in the roles of prosecutor and judge, the same concerns of an interested decisionmaker are present in the follow-on proceeding against the Sztroms. 579 U.S. at 13–14; 349 U.S. at 138–39. Concerns about prejudgment are particularly warranted when the

[6] Indeed, just earlier this month, in *Trump v. J.G.G.*, the Supreme Court reiterated the need for due process in the form of notice and an opportunity to be heard in another context involving federal agency action—aliens being subject to removal proceedings. *See* 145 S. Ct. 1003, 1006 (2025) (per curiam). The Supreme Court emphasized that detainees subject to removal under the Alien Enemies Act (the "AEA") were protected from summary removal, with the AEA requiring notice "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* The Supreme Court's decision demonstrates the need for due process across a range of types of agency action—even where such action affects the rights of noncitizens.

agency that decides the punishment is the same agency that brought the charges, especially when that agency touts its own enforcement statistics each year. *See, e.g.*, SEC Announces Enforcement Results for Fiscal Year 2024, https://www.sec.gov/newsroom/press-releases/2024-186, last accessed on April 29, 2024. It is only natural that agency decisionmakers would defer to colleagues from the same government agency. But such deference, potential prejudgment, and institutional interest in the outcome are inconsistent with the level of neutrality that should be demanded to permanently end an individual's ability to pursue his chosen livelihood.

Without discussing the actual context of what the SEC seeks to impose on the Sztroms or engaging with the reasoning in more recent Supreme Court decisions, the SEC instead relies on a view of administrative law unmistakably from the 1970s and 1980s and out of step with the current legal landscape. In point of fact, even administrative law casebooks from a few years ago would need a rewrite. But, here, the SEC seems to making its arguments from a casebook from decades ago.

In *Blinder*, the Court of Appeals for the D.C. Circuit rejected the appellant's due process challenge to the SEC's follow-on administrative proceeding because the "challenge, fairly viewed, represent[ed] nothing less than an assault on the constitutionality of a principal feature of the Administrative Procedure Act itself." 837 F.2d at 1104. *Blinder* presents a view of deference to the "modern administrative state" that cannot be squared with more recent Supreme Court decisions. *See, e.g.*, *Loper Bright Enters.*, 603 U.S. at 395, 412–13 (holding that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," and must "ensur[e] that the agency acts within [constitutional limits]").

Indeed, the *Blinder* decision was more concerned with the potential for the appellant's due process challenge to "bring down too many procedures designed, and working well, for a

governmental structure of great and growing complexity," than with analyzing the merits of the due process challenge. *Blinder*, 837 F.2d at 1107. It was exactly the kind of elevating expedience and institutional deference over individual rights that the Supreme Court rejected in *Williams*, *In re Murchison*, and *Loper Bright*. Similarly, the Supreme Court noted how the importance of the right to a jury trial in civil cases prevailed over the benefits of "convenience" in *SEC v. Jarkesy*, 603 U.S. 109 (2024). In *Jarkesy*, the Supreme Court noted:

> In the Revolution's aftermath, perhaps the "most success[ful]" critique leveled against the proposed Constitution was its "want of a . . . provision for the trial by jury in civil cases." The Framers promptly adopted the Seventh Amendment to fix that flaw. In doing so, they "embedded" the right in the Constitution, securing it "against the passing demands of expediency or convenience." Since then, "every encroachment upon it has been watched with great jealousy."

*Id.* at 121–22 (internal citations omitted).

Thus, the Supreme Court of late has taken a very different approach to questions of administrative law and the administrative state than the deferential approach of *Blinder* and *Withrow*, with many of the cases involving limits to the SEC's power. For example, the Supreme Court has held that the SEC may not impose monetary penalties in its in-house proceedings, *Jarkesy*, 603 U.S. 109 (2024); that the SEC could not evade or expand the statutory deadlines to commence enforcement proceedings, *Kokesh v. SEC*, 581 U.S. 455, 457, 461 (2017), and *Gabelli v. SEC*, 568 U.S. 442, 447–49 (2013); that the SEC (and FTC) are limited in seeking disgorgement and restitution, *AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67, 70, 75–78 (2021), and *Liu v. SEC*, 591 U.S. 71, 85–87 (2020); that respondents in administrative proceedings may challenge the legitimacy of those proceedings in federal district court rather than endure the proceeding before challenging it in court, *Axon*, 598 U.S. at 180, 189, 195–96, and *Free Enterprise Fund*, 561 U.S.

at 489–91. In a nod to the old law school torts rule "the railroad always wins," what the last decade of constitutional and administrative law teaches us is that "the SEC always loses."

Along with *Loper Bright*, these recent cases demonstrate that *Blinder* and *Withrow* are not consistent with the Supreme Court's current approach to administrative law and in-house administrative proceedings.

The logic of the Supreme Court's decision in *Jarkesy* also supports the Sztroms' due process challenge. 603 U.S. 109, 116–17, 125 (2024). If the SEC cannot impose civil monetary penalties in SEC in-house proceedings—in large part because of the importance since the earliest days of American independence of providing fair and impartial fora to litigants facing potentially severe consequences—then it does not make sense to allow the SEC to permanently bar a person from his chosen livelihood in an SEC in-house proceeding where the SEC is both prosecutor and judge. *Id.*; *see also id.* at 140 ("A defendant facing a fraud suit has the right to be tried by a jury of his peers before a neutral adjudicator. Rather than recognize that right, the dissent would permit Congress to concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch. That is the very opposite of the separation of powers that the Constitution demands."). The Supreme Court in *Jarkesy* criticized exactly what the SEC argues that *Blinder* allows—"concentrat[ing] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *Id.* at 140. The logic of *Jarkesy* should control over the outmoded deference of *Blinder*, and the Court should deny the SEC's motion to dismiss the Sztroms' due process claim.

*2. The SEC's Prosecution of the Sztroms Must Be Adjudicated in an Article III Court (Count II)*

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority[.]" U.S. Const. art. 3, § 2. Here, the Sztroms challenge an ongoing SEC administrative

proceeding that arises under the laws of the United States, which is explicitly assigned to federal court jurisdiction in Article III. *Id*. As the SEC's order that initiated the proceeding (i.e. the OIP) states, the proceeding was "instituted pursuant to Section 203(f) of the Investment Advisers Act of 1940," which is part of the United States Code. *See* 15 U.S.C. § 80b–3(f); *see also In re Sztrom*, 2023 WL 3243514, at *1.

The SEC relies on an attempted distinction between civil monetary penalties and the supposedly "equitable" remedy of an occupational bar. First, even if the SEC were correct that an occupational bar is an equitable remedy, that remedy still requires an Article III adjudication because Article III vests the power to adjudicate "all Cases" in both "Law and Equity" exclusively in federal courts. U.S. Const. art. 3, § 2.

In an effort to avoid the plain text requirement of Article III, the SEC relies on the "public rights" exception to Article III jurisdiction. This limited exception, however, does not apply to the Sztroms' challenge. In *Jarkesy*, the Supreme Court made clear that "[t]he public rights exception is, after all, an *exception*." 603 U.S. at 131 (emphasis in original). "Instead, public rights are a narrow class defined and limited by history. As the Court explains, that class has traditionally included the collection of revenue, customs enforcement, immigration, and the grant of public benefits." *Id.* at 152–53 (Gorsuch, J., concurring); *see id.* at 128–30. This case does not involve any of those things. Instead, this case involves the Sztroms' rights to pursue the careers of their choice—which is their current occupation and through which numerous clients rely on their services. As such, whatever is left of the "public rights" exception following *Jarkesy*, it does not permit the SEC to seek a permanent occupational bar anywhere other than in an Article III Court.

The SEC is also wrong that this case involves merely an "equitable" remedy. A permanent occupational bar—known as the "career death penalty"—cannot be understood as anything other

than a penalty. A permanent industry bar would destroy the Sztroms' business, which they are operating today, without any violations, in service to numerous clients who know of the SEC's prosecution and choose to remain with the Sztroms. An industry bar also cannot restore the "status quo," because the "status quo" is exactly what's happening now—the Sztroms working in the securities industry and assisting clients who depend on their services.

The Supreme Court has stated that "a permanent ban on a person's associating with any registered firm" is a "severe sanction[]." *Free Enter. Fund*, 561 U.S. at 485. In addition, then-Judge Kavanaugh explained at length why occupational expulsions and suspensions are punitive. *See Saad v. SEC*, 873 F.3d 297, 304 (D.C. Cir. 2017) ("Saad II") (Kavanaugh, J., concurring) ("My fundamental problem with this line of cases is that the term 'remedial' makes little sense when describing the expulsion or suspension of a securities broker . . . expulsion and suspension do not provide a remedy to the victim. Under any common understanding of the term 'remedial,' expulsion and suspension of a securities broker are not remedial. Rather, expulsion and suspension are punitive."); *see also Johnson v. SEC.*, 87 F.3d 484, 488 (D.C. Cir. 1996) ("Here, the sanctions imposed by the SEC—censure and a six-month suspension—clearly resemble punishment in the ordinary sense of the word.").

It is also the case that the SEC cannot have its cake and eat it too. In an attempt to bolster its argument that the Sztroms are not entitled to a jury trial, it slaps the label "equitable" on what it intends to do. But equitable relief, pursuant to Article III, must still be imposed by an Article III judge, that is a person nominated by the President and confirmed by the U.S. Senate to wield the judicial power of the United States. Even assuming that the SEC is right that there is no jury trial right, "equitable" doesn't mean the decision can be made by *any person or group of persons*.

3. *The SEC's Administrative Proceeding Violates the Sztroms' Seventh Amendment Right to a Jury Trial (Count III)*

The SEC's motion to dismiss the Sztroms' jury trial claim should also be denied. The SEC's argument is premised almost entirely on its erroneous contention that the SEC's administrative prosecution of the Sztroms seeks only "equitable" remedies in the form of a bar from the securities industry. (SEC's Mot. at pp. 15–17.) But the SEC simply has no constitutional power to impose equitable remedies because Article III vests power to adjudicate cases both "in *Law and Equity*" in the federal courts. U.S. Const. art. 3, § 2. (emphasis added). Thus, the notion of an executive branch administrative agency dispensing "equitable remedies" is an oxymoron. Either the case is one in equity, in which event the Constitution requires it to be adjudicated by an Article III Court, or the case may constitutionally be adjudicated outside of an Article III Court, in which event the case cannot—by definition—be a case in equity. Thus, even if the SEC were correct that a bar from the securities industry—the sanction sought in the SEC's administrative prosecution—is an "equitable remedy," such that the Sztroms could theoretically be denied a jury trial, that does not help the SEC here, because the case would still need to be adjudicated by an Article III Court.

The SEC inadvertently proves this point by analogizing statutory bars to court injunctions while admitting that such injunctions were "the business of courts of equity, not courts of common law." (*Id.* at 15–16.) And, ironically, the SEC already had a full and fair opportunity to seek equitable remedies when it sued the Sztroms in the District Court for the Southern District of California. Indeed, it knew it needed to litigate in federal court if it wished to secure *any* injunction because it also knew that a federal court is the only place it could legitimately obtain an injunction or any other equitable relief. That the SEC declined, when it had the chance, to request that the federal district court issue an injunction barring the Sztroms from the securities industry does not

mean that unilaterally imposing such a bar now, in its own Article II proceeding, can somehow be equated with an equitable remedy.

In any event, the SEC's prosecution does *not* seek to impose "equitable" relief. It seeks a statutory penalty in the form of a permanent bar from the securities industry pursuant to Section 203(f) of the Advisers Act, 15 U.S.C. § 80b–3(f). It makes no difference that this statutory penalty is nonmonetary. Such a penalty would plainly deprive the Sztroms of their private liberty and property rights by restricting them from their chosen profession and chosen means of making a living, and by destroying the business that the Sztroms have built and operated over many years along with their ability to earn a future living through that business. Moreover, the penalty would be imposed at least in part to punish and to deter, and it would—especially being imposed more than seven years after the events that led to the SEC's prosecution—do nothing to "restore the status quo," so it could "make no pretense of being equitable." *Jarkesy*, 603 U.S. at 124 (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987)); *cf. Johnson*, 87 F.3d at 488–89 (holding that the SEC's administrative censure and six-month industry suspension were punitive sanctions and thus a "penalty" within the meaning of the then-applicable statute of limitations). A proceeding threatening to impose such a nonmonetary penalty is no different for Seventh Amendment purposes than the proceeding that imposed monetary penalties in *Jarkesy*.

*4. The Sztroms Have a Statutory Right to a Hearing (Count IV).*

The SEC relies on *Kornman v. SEC*, 592 F.3d 173, 182 (D.C. Cir. 2010), as support for its assertion that the follow-on administrative proceedings against the Sztroms can be decided through summary disposition, that is without any hearing at all. This is incorrect because—as the SEC acknowledges—the D.C. Circuit in *Kornman* "appl[ied] Chevron deference" to hold that the SEC's summary disposition procedure was lawful. (SEC's Mot. at p. 24.) After *Loper Bright*, however, *Chevron* deference is no more. 603 U.S. at 395, 411–13. The Court in *Loper Bright* held:

> Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. Careful attention to the judgment of the Executive Branch may help inform that inquiry. And when a particular statute delegates authority to an agency *consistent with constitutional limits*, courts must respect the delegation, *while ensuring the agency acts within it*. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

*Id.* at 412–13 (emphasis added).

The Supreme Court based its reasoning on the plain language of the APA itself, which requires "that 'the reviewing court'—not the agency whose action it reviews—is to 'decide *all* relevant questions of law' and 'interpret statutory provisions." *Id.* at 372 (quoting the APA, 5 U.S.C. § 706) (emphasis in original). This requirement of the APA is inconsistent with *Chevron*'s directive that where "the statute [was] silent or ambiguous with respect to the specific issue," a court must accept any "permissible" construction of the statute offered up by the respective agency. *Id.* at 396–398 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). Where a statute is ambiguous, "there is a best reading all the same—'the reading the court would have reached' if no agency were involved . . . after applying all relevant interpretive tools." *Id.* at 400 (quoting *Chevron*, 467 U.S. at 843 n.11).

The *Loper Bright* Court rejected the presumption on which *Chevron* was based—that interpretation of ambiguous statutes requires agency expertise—as "misguided," "because agencies have no special competence in resolving statutory ambiguities. Courts do." *Id.* at 400–01. The Court went on to explain, "*Chevron* gravely erred . . . in concluding that the [statutory interpretation] inquiry is fundamentally different just because an administrative interpretation is in play." *Id.* at 401. The purpose of traditional tools of statutory construction utilized by courts on a daily basis is to resolve statutory ambiguities—something "[t]hat is no less true when the

ambiguity is about the scope of an agency's own power—perhaps the occasion on which abdication in favor of the agency is *least* appropriate." *Id.* (emphasis in original). Thus, in light of *Loper Bright*, the SEC's reliance on *Kornman* is misplaced and this Court has the authority to interpret the provisions of the Advisers Act and the APA that require hearings before the SEC is permitted to impose an industry bar on the Sztroms.

With those preliminaries out of the way, the Advisers Act is crystal clear in its requirement that the SEC hold a hearing:

> The Commission, by order, shall censure or place limitations on the activities of any person associated, seeking to become associated, or, at the time of the alleged misconduct, associated or seeking to become associated with an investment adviser, or suspend for a period not exceeding 12 months or bar any such person from being associated with an investment adviser, broker, dealer, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization, if the Commission finds, *on the record after notice and opportunity for hearing*, that such censure, placing of limitations, suspension, or bar is in the public interest and that such person has committed or omitted any act or omission enumerated in paragraph (1), (5), (6), (8), or (9) of subsection (e) or has been convicted of any offense specified in paragraph (2) or (3) of subsection (e) within ten years of the commencement of the proceedings under this subsection, or is enjoined from any action, conduct, or practice specified in paragraph (4) of subsection (e).

15 U.S.C. § 80b–3(f) (emphasis added). Similarly, the APA is clear as to its own hearing requirements where administrative proceedings are involved:

- "Persons entitled to notice of an agency hearing shall be timely informed of— . . . the time, place, and nature of the hearing;" 5 U.S.C. § 554(b)(1);

- "The agency shall give all interested parties opportunity for— . . . to the extent that the parties are unable so to determine a controversy by consent, *hearing and decision on notice* in accordance with sections 556 and 557 of this title." § 554(c)(2) (emphasis added); and

- "A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for full and true disclosure of the facts." § 556(d).

In arguing otherwise, the SEC is essentially saying (based on a case that, in turn, was based on *Chevron* deference) that it can interpret the Advisers Act's requirement to act only "on the record after notice and opportunity for hearing" to mean that it can act without a hearing. How can the SEC possibly argue, after *Loper Bright*, that it can change, by rule, the statutory command for a "hearing" to mean "no hearing"? The SEC may be relying on a circa 1985 administrative law casebook, but this Court should not do so.

The SEC alternatively argues that agencies do not need to hold evidentiary hearings when there are no genuine disputes of material fact. (SEC's Mot. at 22.) In support, the SEC simply assumes that there is no possible dispute here that would merit a hearing for the Sztroms. But the SEC's motion is under Rule 12(b)(6), and the allegations in Sztroms' complaint do not support the presumption that it is "in the public interest" to bar the Sztroms from the securities industry—much less to do so permanently. Indeed, the SEC's assumption—and its unchecked ability to act on such assumptions—highlight the unfairness of the whole proceeding. In the SEC's view, it gets to decide whether there is a dispute over a material fact, which in turn allows it to decide whether the Sztroms get a hearing. In any event, neither the Advisers Act nor the APA supports the exception to the requirement for a hearing. Just as the SEC cannot, consistent with *Loper Bright*,

reinterpret the statutory command for a "hearing" to mean "no hearing," it cannot morph "hearing" into "only sometimes a hearing."[7]

For the reasons discussed at *supra* Part IV.B.1.–3., what the Sztroms are facing is an unconstitutional process that is incompatible with the due process clause of the Fifth Amendment, Article III, and the jury trial right of the Seventh Amendment. But, even if it were somehow appropriate to consolidate in the SEC the roles of prosecutor, judge, and jury—and it is not—the SEC is nonetheless violating the plain text of the Advisers Act and the APA by not even affording the Sztroms a hearing. The old saying goes, "You're entitled to your day in court." But, in the SEC's view, not even that is true.

## V. **<u>CONCLUSION</u>**

For all the foregoing reasons, the Court should deny the SEC's motion to dismiss. The Sztroms request oral argument and are submitting a proposed form of order denying the SEC's motion.

[7] Even though the analysis the SEC is suggesting is beyond the scope of a Rule 12(b)(6) motion and thus improper, it would nonetheless be very difficult to arrive at the conclusion that there is no genuine issue of material fact and that it is in the public interest to permanently bar the Sztroms. To start, none of the Sztroms' clients incurred monetary harm as a result of the Sztroms' alleged violations. (Compl. ¶¶ 19, 28.) Many of the Sztrom's clients chose to continue to have their financial interests represented by the Sztroms even after being advised of the SEC's investigation and the Sztroms' "no admit, no deny" Consent Judgment. (*Id.* ¶ 35.) Moreover, the SEC is proceeding as if the Consent Judgment itself has the same effect as the Sztroms being convicted of or pleading guilty to the violations discussed therein. However, the Consent Judgment was explicitly a "no admit, no deny" resolution (*id.* ¶ 20) and, as such, does not conclusively prove that the Sztroms engaged in the conduct of which they were accused and does not hold the weight that a conviction or guilty plea would. Further, the Sztroms' alleged violative conduct occurred between 2015 and 2018—more that seven years ago. (*See id.*, ¶ 17.) Since then, the Sztroms have been under the watchful eye of the SEC and have remained compliant with the terms of the Consent Judgment in that they have committed no subsequent violations. (*Id.* ¶ 27.) With these facts, if anything it could be said that it cannot be disputed that *it is not in the public interest to bar them*.

Dated: April 29, 2025.

Respectfully submitted,

/s/ *Michael J. Rinaldi*
Michael J. Rinaldi (D.C. 483417)
DUANE MORRIS LLP
30 S. Seventeenth St.
Philadelphia, Pa. 19103
Telephone: (215) 979-1000
Facsimile: (215) 979-1020
MJRinaldi@duanemorris.com

*Counsel for Plaintiffs Michael Sztrom and David Sztrom*

*Of counsel:*
Mary P. Hansen*
Michael D. Crosson*
DUANE MORRIS LLP
30 S. Seventeenth St.
Philadelphia, Pa. 19103
Telephone: (215) 979-1000
Facsimile: (215) 979-1020
MPHansen@duanemorris.com
MDCrosson@duanemorris.com

**Admitted pro hac vice*